UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| TOMMY BRYAN ALVARADO-GARCIA,<br>Petitioner,<br>v.<br>MARKWAYNE MULLIN, *et al*.,<br>Respondents. | CASE NO. 2:26-cv-03013-GJL<br><br>ORDER GRANTING, IN PART, PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner Tommy Bryan Alvarado-Garcia ("Petitioner") is currently detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. Dkt. 1. On August 26, 2026, Petitioner, through counsel, filed a Petition for writ of habeas corpus under 28 U.S.C. § 2241. *Id.* Respondents to the Petition include Markwayne Mullin (the Department of Homeland Security ("DHS") Secretary), David Venturella (Acting Director of ICE), Julio Hernandez (Acting Field Office Director for ICE's Seattle Field Office), Todd Blanche (U.S. Attorney General), and Bruce Scott (Warden of the NWIPC) (collectively "Respondents").[1] The Petition has been fully briefed. Dkts. 1, 5, 8.

[1] Pursuant to Fed. R. Civ. P. 25(d), Respondents Venturella and Hernandez are substituted for Todd Lyons and Laura Hermosillo, respectively.

Having considered the Parties' submissions, the balance of the record, and the governing law, the Court **GRANTS** the Petition (Dkt. 1) **IN PART** and **ORDERS** Petitioner's release from immigration detention and injunctive relief as set forth in the conclusion below.[2]

## I. FACTUAL BACKGROUND

Petitioner is a native and citizen of Venezuela who was apprehended by immigration officials at or near the Paso Del Norte International Bridge in Texas on October 8, 2022. Dkt. 5 at 3; *see* Dkt. 1 at 4. That same day, immigration officials released Petitioner into the United States on humanitarian parole pursuant to 8 U.S.C. § 1182(d)(5). Dkt. 5 at 3; Dkt. 1 at 4; Dkt. 1-2. Petitioner's humanitarian parole was initially set to expire on or around December 2022. Dkt. 1-2. As a condition of his humanitarian parole, Petitioner was enrolled in Alternative to Detention ("ATD") and was required to comply with conditions of supervision, which included a reporting requirement to Enforcement and Removal Operations ("ERO"). Dkt. 5 at 3; Dkt. 7-1.

Between his initial release and eventual re-detention by immigration officials, Petitioner obtained work authorization and employment and has applied for asylum and Temporary Protected Status ("TPS"). Dkt. 1 at 4; Dkt. 1-3; Dkt. 1-4; Dkt. 1-6; *see* Dkt. 5 at 3.

On July 4, 2026, Petitioner was arrested by local law enforcement in Cass County, North Dakota and charged with Driving Under Suspension. Dkt. 1 at 4; Dkt. 5 at 3. This is Petitioner's only criminal history. Dkt. 1 at 4. Petitioner was encountered by immigration officials that same day, placed on an immigration detainer,[3] and re-detained by immigration officials on July 5, 2026. Dt. 1 at 4–5; Dkt. 5 at 3; Dkt. 7-2. Although Petitioner received a Notice to Appear ("NTA") charging him as removable on the day he was re-detained by immigration officials,

[2] The Parties have consented to proceed in this matter before a United States Magistrate Judge. Dkt. 4.

[3] Although an immigration detainer was issued while Petitioner was detained by local law enforcement, there is no contention Petitioner's charge for Driving Under Suspension formed the basis for his re-detention by immigration officials.

Petitioner was not given advance written notice of the reasons for his re-detention. Dkt. 1 at 5; Dkt. 5 at 3; Dkt. 7-4. Respondents allege that immigration officials reviewed Petitioner's case and found "no record that he had been reporting to ERO as required." Dkt. 5 at 3; Dkt. 1-5. However, there is no contention such a review resulted in an individualized flight risk finding, a finding of dangerousness, or other finding forming the basis of the re-detention decision. Dkt. 1 at 5; *see* Dkt. 5. Petitioner has not received a bond hearing, and he remains detained at NWIPC. Dkt. 1 at 4–5; *see* Dkt. 5.

## II. PROCEDURAL BACKGROUND

Petitioner initiated this action on August 19, 2026, and raises one Ground for habeas relief in his Petition. Dkt. 1. In particular, Petitioner alleges that his re-detention was executed without the procedural protections required by the Due Process Clause of the Fifth Amendment. *Id.* at 4–7. Petitioner seeks immediate release from immigration detention and an order enjoining his future re-detention without prior notice or hearing. *Id.* at 7–8. Petitioner submitted evidence in support of the Petition. Dkts. 1-1–1-6. Respondents filed a Return on September 10, 2026, arguing that Petitioner has received all process that is due and that the Petition should be denied on that basis. Dkt. 5. Respondents also filed supporting evidence. Dkt. 6; Dkt. 7, 7-1–7-4. Petitioner filed a timely Traverse and additional evidence. Dkt. 8; Dkt. 8-1.

Having reviewed the Parties' arguments, the factual record, and the relevant legal authority, the Court concludes that Petitioner did not receive adequate process in connection with his current immigration detention and **GRANTS** the Petition (Dkt. 1) **IN PART** on that basis.

## III. LEGAL STANDARDS

### A. Habeas Petitions

Federal courts have authority to grant writs of habeas corpus to individuals in custody if such custody is a "violation of the Constitution or laws or treaties of the United States[.]" 28

U.S.C. § 2241(c)(3). "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and... the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). To obtain habeas relief, habeas petitioners have the burden of demonstrating there is no lawful basis for their detention by a preponderance of the evidence. *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); 28 U.S.C. § 2241(c).

**B. Mandatory Detention Scheme**

8 U.S.C. § 1225 applies to "applicants for admission" to the United States, defined as a noncitizen "present in the United States who has not been admitted or who arrives in the United States[.]" 8 U.S.C. § 1225(a)(1). Applicants for admission face mandatory detention and may only be released on parole "for urgent humanitarian reasons or significant public benefit," § 1182(d)(5)(A). *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018).

This sole exception to mandatory detention, often referred to as humanitarian parole, may be granted "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A). The implementing regulations include another requirement for humanitarian parole: the noncitizen must "present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b). In other words, if a noncitizen has been granted humanitarian parole, it means that a DHS official with authority[4] decided that there were either "urgent humanitarian reasons" or "significant public benefit" justifying the parole of that individual, and that the individual did not pose a security or flight risk. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b).

---

[4] DHS officials authorized to make humanitarian parole decisions are "the Assistant Commissioner, Office of Field Operations; Director, Detention and Removal; directors of field operations; port directors; special agents in charge; deputy special agents in charge; associate special agents in charge; assistant special agents in charge; resident agents in charge; field office directors; deputy field office directors; chief patrol agents; district directors for services; and those other officials as may be designated in writing, subject to the parole and detention authority of the Secretary or his designees." 8 C.F.R. § 212.5(a).

Humanitarian parole may be terminated in two ways; each with their own procedural requirements. First, parole terminates automatically if the noncitizen departs from the United States or "at the expiration of the time for which parole was authorized." 8 C.F.R. § 212.5(e)(1). With automatic termination of parole, no written notice is required. *Id.* Second, if parole is not terminated automatically, either "the purpose for which parole was authorized" must have been accomplished or a DHS official with authority must decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States." 8 C.F.R. § 212.5(e)(2)(i); *see also* 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled[.]"). In such instances, the noncitizen must be provided written notice of the parole termination. 8 C.F.R. § 212.5(e)(2)(i).

Whether automatic or following notice, once a noncitizen's parole has been terminated, implementing regulations require that "any order of exclusion, deportation, or removal previously entered *shall be executed*." 8 C.F.R. § 212.5(e)(2)(i) (emphasis added); *see also* 8 C.F.R. § 212.5(e)(1). "If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the [noncitizen] *shall again be released* on parole unless in the opinion of [a DHS official with authority] the public interest requires that the [noncitizen] be continued in custody." 8 C.F.R. § 212.5(e)(2)(i) (emphasis added). Stated differently, unless detention is required for the timely removal of a noncitizen, continued detention following release on parole must be supported by individualized assessment by an authorized DHS official. *Id.* Otherwise, implementing regulations require that a noncitizen be returned to humanitarian parole. *Id.*

Taken together, the applicable regulatory scheme requires that, where parole has automatically terminated upon expiration and the noncitizen is not returned to custody for either

the timely execution of a removal order or upon an individualized decision by an authorized DHS official, continuation of humanitarian parole may be implied and, thereafter, the procedures for on-notice termination apply. *See, e.g.*, *Dieng v. Hermosillo*, No. 2:26-CV-00190-LK, 2026 WL 411857, at *5–6 (W.D. Wash. Feb. 13, 2026).

**C. Due Process**

The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from depriving any person "of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. Due process protections extend to all individuals within U.S. borders, including noncitizens, regardless of their immigration status. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

Procedural due process demands meaningful notice and a genuine opportunity to be heard before the federal government infringes upon a liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Courts in the Ninth Circuit apply the *Mathews* balancing test in immigration detention cases, weighing: (1) the private interest affected; (2) the risk of erroneous deprivation under existing procedures and the value of additional safeguards; and (3) the government's countervailing interest, including fiscal and administrative burdens. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022); *see also E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1321 n.4 (W.D. Wash. 2025) (collecting cases).

## IV. DISCUSSION

The Court assesses whether Petitioner's re-detention without prior written notice and an opportunity to be heard comported with due process under the familiar three-part *Mathews* framework.

First, Petitioner's private interest is substantial. Petitioner was paroled into the United States and lived outside of immigration detention for almost four years before Respondents

abruptly returned him to physical custody. During that time, Petitioner obtained work authorization and employment and applied for asylum and TPS in the United States. Dkt. 1 at 4. His interest in maintaining that liberty, and avoiding renewed physical confinement by immigration officials, lies at the core of the liberty interests protected by the Due Process Clause. *See Zadvydas*, 533 U.S. at 690; *Padilla v. U.S. Immigr. & Customs Enf't*, No. 24-2801, 2026 WL 2822044, at *11 (9th Cir. Sept. 21, 2026). *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. 2025); *Torres v. Hermosillo*, 25-cv-02687-LK, 2026 WL 145715, at *5 (W.D. Wash. Jan. 20, 2026) (collecting cases recognizing liberty interests of those released on humanitarian parole). That Petitioner was detained by local law enforcement the day before his re-detention by immigration officials does not extinguish his liberty interest. *See Arevalo-Hortua v. Hernandez*, No. 2:26-CV-02994-JHC, 2026 WL 2797986, at *6 (W.D. Wash. Sept. 18, 2026). Thus, the first *Mathews* factor weighs heavily in Petitioner's favor.

Second, the procedures employed here created a substantial risk of erroneous deprivation, while additional process would have offered significant value. To begin, Respondents' failure to adhere to the regulatory scheme governing revocation of Petitioner's humanitarian parole created a heightened risk of erroneous deprivation in this case. *Torres*, 2026 WL 145715, at *7 ("[T]he risk of erroneous deprivation is significant where the government fails to follow its own procedures for revocation of parole, thus depriving the noncitizen of process due prior to revocation.") (collecting cases).

As outlined in Section III. B. above, several procedural protections apply to humanitarian parole decisions. For example, unless automatically terminated by expiration of parole or the noncitizen's departure from the United States, a noncitizen is entitled to written notice that their humanitarian parole is being revoked. 8 C.F.R. § 212.5(e)(1). For noncitizens entitled to notice, termination of humanitarian parole requires the "accomplishment of the purpose for which parole

was authorized" or for an authorized DHS official to decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States." 8 C.F.R. § 212.5(e)(2)(i). Courts in this District have concluded that where humanitarian parole automatically expires but immigration officials do not timely return the noncitizen to custody, continuation of parole may be implied and the procedures governing on-notice termination thereafter apply. *See, e.g.*, *Caisa Telenchana v. Hermosillo*, No. 2:26-CV-00363-GJL, 2026 WL 696806, at *11–12 (W.D. Wash. Mar. 12, 2026); *Len Nava v. Markwayne Mullin*, No. 2:26-CV-02324-TLF, 2026 WL 2294576, at *2 (W.D. Wash. Aug. 10, 2026).

Respondents first contend that the on-notice termination procedures did not apply in this case because Petitioner's humanitarian parole initially expired in December 2022. Dkt. 5 at 5. However, because Petitioner was not re-detained until nearly four years after the initial expiration of his humanitarian parole, this argument is unavailing. *Caisa Telenchana*, 2026 WL 696806, at *11–12; *Len Nava*, 2026 WL 2294576, at *2. Respondents next argue that the NTA provided to Petitioner on the same day that he was re-detained satisfied the written notice requirement in 8 C.F.R. § 212.5(e)(1). The Court does not agree for the same reasons discussed in *Kozlenkko v. Hernandez*, No. C26-3147-KKE, 2026 WL 2905404, at *4 (W.D. Wash. Sept. 28, 2026) (outlining several problems with this position, including that the NTA was issued following arrest and did not include the reasons for the revocation of parole). Finally, while their briefing engages with the written notice requirement, Respondents are conspicuously silent as to the other procedures required for on-notice termination of humanitarian parole. That is, Respondents do not contend that the purposes for Petitioner's parole had been accomplished or that an authorized DHS official determined Petitioner's parole was no longer warranted for humanitarian reasons or the public benefit as contemplated by 8 C.F.R. § 212.5(e)(2)(i). Thus,

based on the current record, it appears the regulatory procedures for revocation of Petitioner's humanitarian parole were not followed.

Moreover, by nature of his prior release on humanitarian parole, immigration officials previously determined that Petitioner presented neither a security risk nor a risk of absconding. 8 C.F.R. § 212.5(b). While circumstances may have changed, that prior determination illustrates that an untested re-detention decision would create an unacceptably high risk of erroneous deprivation. Here, it is undisputed that Petitioner has received no hearing before a neutral decisionmaker at which the factual and legal basis for his renewed detention could be tested. Such procedures would therefore have substantial value in reducing the risk of an erroneous deprivation of Petitioner's liberty.

Taken together, the lack of adequate written notice, an individualized assessment by an authorized DHS official supporting Petitioner's renewed detention, and any opportunity for review of Petitioner's re-detention in a neutral forum created a substantial risk of erroneous deprivation. *See Uisimbayev v. Scott*, No. 2:26-CV-03061-JHC, 2026 WL 2797987, at *5 (W.D. Wash. Sept. 18, 2026) (finding due procedural process violation where, in addition of failure to follow procedures outlined in § 212.5, the government failed to provide a custody hearing in a neutral forum). The second *Mathews* factor therefore weighs strongly in Petitioner's favor.

Third, the Court recognizes the Government's substantial interest in the efficient administration and enforcement of the immigration laws, including its lawful authority to detain noncitizens when appropriate. But Respondents identify no concrete administrative burden that would have resulted from providing Petitioner a parole termination decision by an authorized DHS official or the opportunity to test the reasons for his re-detention in a neutral forum. As the Court has repeatedly recognized, custody hearings are routine proceedings, and the marginal administrative burden associated with providing such review is insufficient to outweigh the

substantial liberty interest implicated by physical detention. *See E.A. T.-B.*, 795 F. Supp. 3d at 1324; *Ledesma Gonzalez v. Bostock*, No. 2:25-cv-01404-JNW-GJL, 2025 WL 2841574, at *8 (W.D. Wash. Oct. 7, 2025). The third *Mathews* factor therefore also favors Petitioner.

On balance, the *Mathews* factors establish that the process afforded here was constitutionally inadequate. Accordingly, the Court concludes that Respondents re-detained Petitioner without providing the process due to him under the Fifth Amendment to the United States Constitution.

## V. REMEDY

### A. Immediate Release

Having determined that Petitioner was re-detained without the constitutionally required process, the Court now determines the appropriate remedy for his unlawful confinement. Petitioner seeks immediate release from immigration detention. Dkt. 1 at 7. The Court agrees that immediate release is the appropriate remedy here.

"[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and... the traditional function of the writ is to secure release from illegal custody." *Preiser*, 411 U.S. at 484. "In modern habeas practice, courts often 'employ a conditional order of release,' which orders the government to release the petitioner unless it 'takes some remedial action' that corrects" the government's violation of the law. *Cardozo v. Bostock*, No. 2:25-CV-00871-TMC, 2025 WL 2592275, at *2 (W.D. Wash. Sept. 8, 2025) (quoting *Harvest v. Castro*, 531 F.3d 737, 741–42 (9th Cir. 2008)).

This Court and others in this District have ordered conditional release where, for example, the record showed that ICE officials performed some individualized assessment of flight risk, dangerousness, or noncompliance with release conditions before re-detaining a petitioner and that assessment provided the basis for the re-detention decision. *See, e.g., Caisa*

*Telenchana*, 2026 WL 696806, at *13; *Singh v. Noem*, No. 2:26-cv-00246-BAT, 2026 WL 592265, at *3 (W.D. Wash. Mar. 3, 2026); *Balwan v. Bondi*, No. 2:26-cv-00248-LK, 2026 WL 497098, at *5 (W.D. Wash. Feb. 23, 2026); *see also Musaev v. Hermosillo*, No. 2:26-CV-00522-RAJ, 2026 WL 925611, at *8 (W.D. Wash. Apr. 6, 2026) (ordering immediate release where, despite some individualized review by immigration officials, there was no allegation or evidence showing the government's re-detention decision was premised on such review).

Although Petitioner was charged with Driving Under Suspension at the time of his re-detention, Respondents do not claim this pending criminal charge was the reason for Petitioner's re-detention.[5] Upon encountering Petitioner while in the custody of local law enforcement, however, Respondents suggest that immigration officials reviewed the circumstances of Petitioner's case and found "no record that he had been reporting to ERO as required." Dkt. 5 at 3. But Respondents submit no evidence demonstrating that this review actually provided the basis for the decision to re-detain Petitioner. Dkt. 6 at 2 (stating review was conducted by unspecified individuals but establishing no nexus to subsequent re-detention decision).

Moreover, Respondents' representations concerning the purported review are difficult to reconcile. Respondents maintain that Petitioner was released on humanitarian parole and subject to certain conditions beginning on October 8, 2022, and contend that this parole automatically expired in December 2022. Dkt. 5 at 3. Yet Respondents simultaneously rely on Petitioner's purported failure to comply with ERO reporting requirements in describing the individualized circumstances allegedly reviewed by immigration officials prior to his re-detention in July 2026. *Id.* Respondents cannot have it both ways, and they fail reconcile their position that Petitioner's

[5] It is not clear the appropriate remedy would differ even if Respondents made such a claim. Rather, "courts in this District have concluded that, even when a noncitizen has been arrested or charged, but not convicted, of a crime, when the noncitizen is re-detained without pre-deprivation notice and a hearing, release is the appropriate relief." *Arevalo-Hortua*, 2026 WL 2797986, at *6.

parole expired with their contention that he nevertheless remained subject to reporting requirements years later, nor do they identify an alternative source of any reporting requirement with which Petitioner allegedly failed to comply.

These internal inconsistencies in Respondents' position aside, Respondents have not demonstrated that an individualized assessment, even if one was performed, actually provided the basis for the decision to re-detain Petitioner. Accordingly, the Court finds that immediate release, rather than a conditional writ, is the appropriate remedy in this case.

**B. Injunctive Relief**

Petitioner also requests injunctive relief. Dkt. 1 at 8. Particularly, Petitioner asks that Respondents be prohibited from re-detaining him during the pendency of his removal proceedings without providing written notice and a hearing prior to re-detention at which Respondents would bear the burden of proving by clear and convincing evidence that he is a flight risk or a danger to the community and that no alternatives to detention would mitigate those risks. *Id.* The Court concurs that, consistent with the requirements of due process, Respondents must provide adequate notice and a hearing before a neutral decisionmaker in conjunction with future re-detention decisions while Petitioner's removal proceedings are pending. With respect to the timing and evidentiary burden required, however, the Court declines to prescribe a particular procedural framework for all possible re-detention decisions Petitioner may face.

## VI. CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following:

(1) Petitioner's Petition (Dkt. 1) is **GRANTED IN PART**;

(2) Respondents **SHALL release** Tommy Bryan Alvarado-Garcia from custody **within 24 HOURS** of this Order under conditions consistent with those in place

at the time of his prior release, if any, unless Respondents choose to impose less restrictive conditions;

(3) Respondents and all their officers, agents, employees, attorneys, and persons acting on their behalf or in concert with them **SHALL NOT** re-detain Petitioner unless an Immigration Court hearing is held (on adequate notice) to determine whether detention is appropriate, or until Petitioner is issued a final order of removal; and

(4) Respondents **SHALL** file a certification within **48 HOURS** of the issuance of this Order, confirming that the Petitioner has been released from custody and providing the date and time of his release.

Finally, the Court will entertain any post-judgment motion for attorney's fees, as requested in the Petition. Any fee petition must be filed within the deadline set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

Dated this 7thday of October, 2026.

Grady J. Leupold
United States Magistrate Judge